## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. GJH-22-361** |
| | * | |
| **JOLEN MICHAEL GHORBANI,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ******* | |

## SENTENCING MEMORANDUM ON BEHALF OF JOLEN MICHAEL GHORBANI

Respectfully submitted,

 /s/ Stuart A. Berman
Stuart A. Berman (Bar No. 08489)
Lerch Early & Brewer, Chtd.
7600 Wisconsin Avenue
Suite 700
Bethesda, Maryland 20814
T: (301) 657-0729
F: (301) 347-1538
saberman@lerchearly.com
Counsel for Jolen Michael Ghorbani

Dated: February 17, 2023

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT ...........................3

        A.      Jolen Ghorbani's Life Prior to February 3, 2021 ....................................3

        B.      Ghorbani's Cooperation with the Government ...................................... 6

        C.      Background Facts Related to Current Offense ....................................... 9

III.    THE ADVISORY SENTENCING GUIDELINES AND 18 U.S.C. § 3553(a) ...............10

        A.      Downward Departure.................................................................... 11

        B.      18 U.S.C. § 3553(a) Factors........................................................... 12

                1.      Nature and Seriousness of the Offense and History and
                        Characteristics of the Defendant — Including Cooperation................... 15

                2.      Deterrence ................................................................... 18

                3.      Protecting the Public from the Defendant................................. 18

                4.      Educational and Vocational Training and Medical Care......................... 18

                5.      Avoiding Unwarranted Sentence Disparities with Other
                        Obstruction of Justice Defendants — and with the
                        Kidnapping Conspirators ....................................................... 19

IV.     RECOMMENDATION AND CONCLUSION...............................................................20

4872794.1                                                                                        95217.001

# I.    INTRODUCTION

Prior to February 3, 2021, Jolen Ghorbani's life as a teenager and young adult in northern Virginia was a story of one step forward and two steps back. As a teenager, he started drinking and using drugs and got involved in a neighborhood "gang" in his Fairfax County townhouse complex that led to felony convictions and several years of incarceration. Despite enrolling in several treatment programs, Jolen repeatedly abused alcohol and drugs, leading to probation violations and additional Virginia state court convictions for drug- and alcohol-related offenses. But even as he stumbled backwards, Jolen also developed life skills, a work ethic, and a big heart. He graduated from high school and completed community college courses. He earned a barber's license and worked as a barber, a restaurant server, and a variety of other jobs. He had a steady girlfriend and his own apartment. He held family close to his heart — literally, in the case of a tattoo of his beloved grandmother. In early 2021, albeit somewhat unsteadily, he was taking one step forward.

That all changed when Jolen made an ill-fated trip to the MGM casino and hotel in Oxon Hill, Maryland. There he met Tray David Sherman, a/k/a "Racks," a/k/a "Fat Det" ("Sherman") and Anthony Erik Hebron, a/k/a "Pain" ("Hebron"). Sherman and Hebron falsely promised Jolen that if he went with them from Maryland to Southeast Washington, D.C. and procured cocaine and money, they would introduce him to women. Around 7:30 a.m. on February 3, 2021, Jolen got into Sherman's Mercedes-Benz with Sherman and Hebron and rode with them into the District of Columbia. Jolen upheld his end of the deal by obtaining cocaine from a supplier in Southwest D.C. Sherman then drove to a location in Southeast D.C., where Jolen, Sherman, and Hebron were joined by Darius Lawrence Young, a/k/a "Mup" ("Mup"), and Christopher Allen Young, a/k/a "40" ("Young"). Hebron pointed a gun at Jolen. Then Hebron, Sherman, Mup and

Young stole Jolen's cocaine, wallet, cellphone, watch, and key to his room at the MGM. When Jolen refused to divulge the code to the safe in his hotel room, Hebron struck him in the forehead with his gun. Jolen surrendered the code, Young and Mup took him out of the Mercedes, and Sherman and Hebron drove back to the casino. Young and Mup hauled Jolen into the utility room of a public housing apartment building, assaulted him, threatened his life, and forced him to give up the PIN number to his ATM card and details about what was in his hotel room safe. After Sherman and Hebron stole more than $10,000 in cash, casino chips, a watch, and an Xbox from Jolen's room, Mup and Young fled the apartment building. Jolen walked out onto the street, where law enforcement found him with blood running down his face from the wound on his forehead, cuts on his mouth and eye, and a broken nose.

As the victim of this horrific kidnapping, assault, and battery, Jolen cooperated with the U.S. Attorney's Office and law enforcement agents in the investigation and prosecution of Sherman, Hebron, Mup, Young, and Lamar Jamal Perkins. By April 2022, four defendants had pleaded guilty, but Sherman maintained that he was going to trial, beginning on July 11, 2022. Terrified that Sherman's confederates were still in a position to harm him, and understandably reluctant to testify against Sherman, Jolen moved from Virginia to Florida and undertook the foolhardy scheme to avoid testifying that brings him before this Court for sentencing following his conviction for a violation of 18 U.S.C. § 201(b)(4).

When the scheme collapsed and he was arrested in Florida, Jolen promptly acknowledged his culpability. He consented to detention and quickly negotiated a plea agreement. He accepts responsibility for violating the statute that forbids witness bribery and asks this Court to punish him fairly for that conduct. If the Sentencing Guidelines treated his conduct for what it was — obstruction of justice — his offense level after acceptance of responsibility would be 12.

Instead, however, Jolen faces a situation straight out of *Alice's Adventures in Wonderland*, in which the Sentencing Guidelines, read literally, recommend that he be sentenced as an "accessory after the fact" *to his own kidnapping*, with an enhancement for the use of a dangerous weapon *that was used against him.* Such a result would be absurd. Fortunately, federal sentencing law offers a path towards a just outcome. The Guidelines themselves recognize that "[d]epartures permit courts to impose an appropriate sentence in the exceptional case in which mechanical application of the guidelines would fail to achieve the statutory purposes and goals of sentencing." U.S.S.G. § 5K2.0 cmt. background. And 18 U.S.C. § 3553(a) requires the Court to take into account a broad array of factors in addition to the Guidelines and then "impose a sentence sufficient, but not greater than necessary," to comply with statutory purposes.

Taking into account all of the circumstances of this truly unique offense, the Court should grant a downward departure pursuant to U.S.S.G. § 5K2.0 and grant a variance from the guidelines under § 3553(a), and then sentence Jolen Ghorbani — first a crime victim, then a cooperator in the prosecution of four kidnappers, and finally a terrified witness who drank and stumbled his way into being a boneheaded criminal — to a year-and-a-day of incarceration.

## II.  THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

### A.  Jolen Ghorbani's Life Prior to February 3, 2021

Jolen Ghorbani's personal history is set forth in his letter to the Court and letters from his family members, submitted collectively under seal as Ex. 1. Jolen Ghorbani grew up in northern Virginia. His father Faramarz (Jason) emigrated to the United States from Iran and worked for automobile dealerships. His mother Jacqueline worked as an executive assistant at several entities in northern Virginia, including Raytheon Technologies and Freddie Mac. Her family

came from Cuba, where Jolen's late maternal grandmother, Emma Cabrera, was "Miss Cuba." Jolen was particularly close to her and honors her memory with a tattoo. *See* PSR ¶ 67.

As a teenager, Jolen started hanging out with the proverbial "wrong group of kids." He began to use alcohol and drugs and became part of a gang named after the suburban community where he lived, the Kingsley Commons Townhouses in Falls Church, Virginia. While the "Kingsley Commons" gang was a far cry from MS-13, when Jolen was 15 years old the gang participated in a violent assault that led to Jolen's conviction in 2010 in Fairfax County Circuit Court of the felonies of maiming by mob and criminal street gang participation. He was sentenced to commitment to the Department of Juvenile Justice until his 21st birthday, to be followed by concurrent sentences of ten and five years of imprisonment, which were suspended in favor of five years of probation.

Jolen spent several years at the Beaumont Juvenile Correctional Center in southern Virginia, where he completed high school and courses in anger management and substance abuse. From the beginning of his incarceration to this day, Jolen's life has toggled between periods of hard work, perseverance, and discipline and periods of lawbreaking and foolishness, often fueled by substantial servings of alcohol. During his juvenile incarceration, Jolen participated in Beaumont's Institutional Work Program by working in the kitchen and dining hall, including busing and clearing tables and washing dishes. He also took a leadership role in his living unit or "pod," where he was tasked with insuring the unit's cleanliness. He ordered cleaning supplies, ensured that the common room was kept clean, and encouraged other residents of the pod to keep their cells in order. Prior to his release on February 22, 2013, Jolen was accepted to Northern Virginia Community College, where he later completed courses in business administration.

After returning to his family, Jolen worked at an automobile dealership, an electronics store, and restaurants, and eventually obtained his barber's license and worked for a number of hair styling businesses. But beginning in 2014 he picked up additional drug- and alcohol-related charges and traffic offenses in Fairfax County and Arlington County and periodically was hauled before the Fairfax County Circuit Court for probation violations. In September 2014, the court found him in violation of probation and sentenced to one year and two months incarceration. Jolen completed a serious and violent offender reentry program successfully in June 2016.

In the years that followed, Jolen continued to oscillate between hard work and run-ins with the law, between successfully completing multiple treatment programs and relapsing back into alcohol and drug abuse. Probation officers and judges understood that he was trying hard to overcome his demons and that his screw-ups hurt him more than anyone else. Throughout the period preceding the events in this case, judges in Fairfax County — hardly a lenient jurisdiction — saw the good as well as the bad and continued Jolen on probation in hopes that his deeds would eventually match his good intentions and that one of the many treatment programs he was sent to would finally do the trick and help him control his addictive tendencies.

The same pattern persisted right up through the time of the offense committed against Jolen and the offense he committed. He ended up at the MGM Casino because he had been working hard at multiple jobs and had some money in his pocket. He ended up a victim of crime because he entered into a dodgy arrangement very, very late at night at the casino, an arrangement in which Jolen would be the one procuring cocaine. When he fled to Florida, Jolen again worked multiple jobs and started getting his life in order, but also drank to excess and made criminally poor decisions. The events leading to those decisions are discussed next.

### B.     Ghorbani's Cooperation with the Government

The first FBO Form 302 memorandum related to the February 3, 2021 kidnapping and violent assault (Ex. 2) captures Jolen's terror and confusion after he survived the brutal attack:

On 2/3/2021 members of the FBI Safe Streets Task Force (SSTF) were on surveillance in the vicinity of in the 600 block of 46th Place, SE, Washington, DC. The SSTF had received information regarding a potential Kidnapping was ongoing in the area.

At approximately 10:55 am, SA Mulvihill observed DARIUS YOUNG wearing a puffy white winter coat and light colored jeans and a tall thin black male wearing all black walking out of the woods along the fence line behind 604 46th Place, SE, Washington, DC (WDC). They continued to walk south along the side of the building at the top of the hill on the east side of 46th Street, SE, WDC, to east on the sidewalk just south of 620 46th Street, SE, WDC and were no longer observed by SA Mulvihill.

A few moments later at approximately 10:57am, JOLEN MICHAEL GHORBANI … made contact with SA James Mulvihill on 46th Street, SE just south of F Street, SE, WDC. GHORBANI was walking south on 46th Street, SE and approached SA Mulvihill's vehicle asking for a cigarette. SA Mulvihill observed GHORBANI wearing a black The North Face jacket with a fur lined hood, black skull cap under the hood. GHORBANI had blood running down his face, a bloody lower lip, and a busted nose. SA Mulvihill asked GHORBANI was he ok and what happened. He stated he fell on some ice and really just wanted a cigarette. SA Mulvihill explained to GHORBANI he was law enforcement and asked if he wanted to get into the back passenger seat of his vehicle. SA Mulvihill drove with GHORBANI in his vehicle to the parking lot for Fletcher-Johnson Education Center so they could talk and get off the street.

GHORBANI refused medical treatment while at the parking lot. He stated that he wanted to go to the MGM Grand casino, located at the National Harbor. He said he was at the MGM all night playing Black Jack and Roulette, during this time he met two black males while playing. GHORBANI kept saying he didn't want to make a statement to police, he was glad to just be alive. He stated that he was beaten and held captive by four unknown black males.That he made the mistake of getting in the car with them and made an agreement for his life that he wouldn't say anything about what happened to him. GHORBANI [s]tated that he was beaten and his life threatened, they tookhis watch, wallet, ID, phone, etc.

GHORBANI kept saying all he wanted was a cigarette and coffee, that he didn't want to make a report, after explaining bits of what happened to him he would resort back to saying forget it I'm not talking to the police,that he had

slipped on ice. He continued to ask for some coffee, cigarette, and take him to the MGM Grand.

Task Force Officer Thompson drove Jolen to a Dunkin Donuts in Capitol Heights, Maryland, where they were joined by SA Mulvihill. SA Mulvihill told Jolen that he might be able to identify the kidnappers and asked if an individual wearing a white puffy coat was involved. Jolen said "you may be onto something" and, after a few more minutes of discussion, they drove Jolen to the MGM Casino and took him to his room. Jolen identified what had been stolen. He then stated that he should have never got involved a business deal with these guys and said that he got into a black sedan with the two unknown black males he had met while gambling so that they could get some marijuana. However, when a detective from the Metropolitan Police Department kidnapping unit arrived, Jolen was still fearful of providing full information about the attack:

> … He told Det. Aceto he was angry and wasn't going to make a statement. He stated he wasn't going to say any more that he was going to get weed with the guys he met, they stopped two more black males jumped in the car putting him in the middle of them in the back seat. He said they put a gun to his head and continued to drive a few blocks, before stopping. After a few blocks they stopped and forced GHORBANI out of the car into a boiler room, proceeded to beat him, put a gun to his head, put gun in his mouth held him and after a few hours made a deal with him not to say anything in order to live. GHORBANI repeatedly stated he was lucky to be alive and made the deal for his life and would not make a statement because of that.

Eventually, the discussion ended and TFO Thompson took Jolen to his aunt's house in Fairfax, Virginia. During the ride, Jolen provided some additional information about the attack. Ex. 3.

The following day, law enforcement agents visited Jolen at his aunt's house. Ex. 4. Now that the shock and trauma of the previous day's events had somewhat subsided, Jolen stated that if law enforcement was able to obtain surveillance camera footage from the casino, he could help

point out individuals involved in his kidnapping. More specifically, he said that the video would show him leaving his room with two black males, one of them dragging a blue suitcase. He also provided more details about the violent attack in the apartment building:

> GHORBANI said the boiler room they put him in was inside a building basement. That the individuals held a gun to his lower back after removing him from the black sedan and to not say anything. He said they made him walk up a hill through the woods and snow. At the top of the hill was a fence with a hole in it they went through. The boiler room was just past the fence hole it was an old door and when inside they had him sit on a plastic milk crate. GHORBANI stated that after they beat him, threatened his life, took his belongings, he believes that the two individuals that left went back to the MGM and cleaned out his remaining belongings. GHORBANI stated that he gave up his MGM room safe code and cell phone code while being threatened to be killed. He said that after two of the individuals left the two that stayed with him continued to talk on the phone with the others.

> GHORBANI stated that before the remaining two individuals left they told him to count to 1000 before he could leave or he would be killed.

> GHORBANI stated that the two remaining individuals left and he counted to about 400 and left. He walked out of the boiler room went back through the hole in a fence and down a snowy hill through some woods into a small apartment building parking lot. He stated that he walked a few blocks up a street asking two other cars for cigarettes before he came in contact with SA Mulvihill.

Jolen repeated that he would be willing to meet up with SA Mulvihill and TFO Thompson again if needed to go through some pictures and video.

On February 17, 2021, Jolen met with SA Mulvihill, TFO Thompson, and AUSAs Jeffrey Izant and Leah Grossi at the Greenbelt courthouse and reviewed the events of February 3 in detail. Ex. 5. The same day, he testified before the grand jury. Ex. 6.

On March 31, 2021, the government filed criminal complaints and then an indictment against Sherman, Perkins, Hebron, Darius Young, and Christopher Young. During the remainder of 2021, Jolen continued to cooperate with the government. Beginning in February 2022, the defendants started to sign plea agreements and plead guilty: Perkins on February 4, 2022;

Christopher Young on February 17, 2022; Darius Young on April 12, 2022; and Hebron on April 14, 2022. *See* Docket in Crim. No. GJH-21-80. That left only Sherman to be tried. Even though the government will not be asking the Court for a downward departure pursuant to U.S.S.G. § 5K1.1 to account for Jolen's cooperation in the kidnapping case, there can be little doubt that the availability of the victim witness to testify played a significant role in the government's ability to secure these four convictions. Indeed, even after only Sherman remained to be tried, Jolen continued to cooperate with the government. On May 10, 2022, Ghorbani met with TFO Thompson and AUSA Izant again at the office of Jolen's attorney in Fairfax City to review additional details about the kidnapping and assault. Ex. 7 and 8.

**C.**     **<u>Background Facts Related to Current Offense</u>**

Throughout the period between the kidnapping and the commission of the current offense, Jolen remained terrified. On April 1, 2021, the government issued a press release regarding the indictment of the kidnappers. Ex. 9. The press release led to widespread news media coverage. *See* Ex. 10. The articles and broadcasts were posted on social media, leading the persons posting comments labeling Jolen as a "rat." Jolen and a friend quickly packed up a vehicle and fled to Jacksonville, Florida, where Jolen's brother and sister-in-law lived. In his haste, Jolen failed to secure permission to move from his state probation officer in Fairfax County and the court issued a warrant. Jolen returned to Fairfax and pleaded guilty to absconding, but the Circuit Court did not impose any backup prison time for the probation violation. Eventually, Virginia transferred probation to Florida and Jolen moved to Fort Lauderdale, where he rented an apartment, got a serving job at a Cheesecake Factory, and applied for and obtained work as a barber.

On June 8, 2022, TFO Thompson, AUSA Izant, and SAUSA Jared Engelking conducted a telephone interview with Jolen. On June 21, 2022, TFO Thompson and AUSA Izant went to Fort Lauderdale, Florida to meet personally with him. Ex. 8. During these discussions, they told Jolen that Sherman was going to trial. Jolen asked for relocation expenses and was told that request was likely to be granted. Jolen expressed his apprehension about testifying and asked the government to offer a more lenient plea deal to Sherman, which the government said they could not do. He also asked for restitution payments. *Id.* In light of everything that had happened to him, Jolen's apprehension, and his request for compensation, was understandable and reasonable. Unfortunately, because of the stress of the situation, Jolen was also drinking heavily. During one such drunken episode, he sent the first Instagram messages to Sherman's account, beginning the string of events that transformed him from cooperating witness into defendant.

### III.   THE ADVISORY SENTENCING GUIDELINES AND 18 U.S.C. § 3553(a)

The base offense level for obstruction of justice under U.S.S.G. § 2J1.3(a) is 14, reduced to 12 in cases where the defendant accepts responsibility. Jolen does not dispute that mechanical application of U.S.S.G. § 2J1.3(c) requires a cross-reference to the accessory after the fact guideline, § 2X1.3. And he does not dispute that calculation of his offense level pursuant to that cross-reference results in a final offense level of 25. But Jolen vigorously asserts that applying the guidelines to make him an "accessory after the fact" to his own kidnapping, with an enhancement for a weapon that was shoved into his mouth and used to smash his head open, is unconscionable. He proposes that this Court correct this unjust result through a downward departure pursuant to U.S.S.G. § 5K2.0 and a downward variance pursuant to 18 U.S.C. § 3553(a).

## A.    <u>Downward Departure</u>

U.S.S.G. § 5K2.0(a)(1) provides that in cases other than child crimes and sexual offenses, " … The sentencing court may depart from the applicable guideline range if — (A) … the court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating or mitigating circumstance…." Additionally, § 5K2.0(a)(2) provides that "[a] departure may be warranted in the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." Commentary 3(A)(i) recognizes that there are circumstances the Commission may not have taken into account in setting offense levels, and that if the offense guideline "does not adequately take that circumstance into consideration in setting the offense level for the offense, and only to the extent not adequately taken into consideration, a departure based on that circumstance may be warranted." Commentary 5 states that "[a] departure may be based on justifiable, non-prohibited reasons for departure as part of a sentence that is recommended, or agreed to, in the plea agreement and accepted by the court." Finally, the background statement to the commentary states, among other things, that "[d]epartures permit courts to impose an appropriate sentence *in the exceptional case in which mechanical application of the guidelines would fail to achieve the statutory purposes and goals of sentencing*."

This is just such an exceptional case. Jolen respectfully submits that a case in which mechanical application of the Guidelines results in a calculation of his punishment based on a kidnapping in which *he* was the victim fails to achieve the purposes and goals of 18 U.S.C. § 3553. The Fourth Circuit has held that "[t]he language of the Sentencing Guidelines is to be given its plain and ordinary meaning, unless to do so would produce an absurd result contrary to the drafter's manifest intent." *United States v. Hatten,* 2007 WL 1977663 (4th Cir. July 5, 2007)

(quoting *United States v. Zapata,* 139 F.3d 1355, 1359 (11th Cir. 1998); *see also United States v. Cortez-Gonzalez,* 929 F.3d 200, 203 (5th Cir. 2019) (citation omitted); *United States v. Holbrook,* 499 F.3d 466, 469 n.2 (2d Cir. 2007). It is hard to imagine that the drafters of § 2J1.3(c)(1) ever imagined that the cross-reference would be used to enhance the punishment of the victim of a crime.

For this reason, Jolen requests that the Court begin the sentencing process by granting a downward departure pursuant to § 5K2.0. Pursuant to paragraph 7 of the plea agreement, Jolen's recommendation (which does not bind the Court) is limited to four levels.[1] A four-level departure would reduce the final offense level to 21.

### B.     18 U.S.C. § 3553(a) Factors

Jolen requests that the Court complete the move from the advisory guidelines range to an appropriate and just sentence through a downward variance pursuant to 18 U.S.C. § 3553(a).

The Supreme Court has "instructed district courts to read the United States Sentencing Guidelines as 'effectively advisory.'" *Kimbrough v. United States*, 552 U.S. 85, 90 (2007) (quoting *United States v. Booker*, 543 U.S. 220, 245 (2005)). In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court provided the following steps for a sentencing court: (1) calculate the Guidelines range; (2) give both parties an opportunity to argue for an "appropriate" sentence; (3) consider all factors listed in § 3553(a) to determine if they support a sentence requested by

---

[1]     In addition to § 5K2.0, the Court should take into account that the Guidelines also recognize — albeit in somewhat different circumstances, most commonly an interaction between a defendant and a somewhat culpable victim — that a sentencing judge can consider "[t]he danger reasonably perceived by the defendant…." U.S.S.G. § 5K2.10. While the victim in the present offense is the judicial system, § 5K2.10 stands for proposition that in considering a downward departure request the Court can take into account the danger Jolen reasonably perceived from the five defendants and their extended network. *See Koon v. United States,* 518 U.S. 81, 101 (1996).

either party; and (4) adequately explain its reasons for choosing the sentence, including any justification for any variance. *Id.* at 49-50. The Court "may not presume that the Guidelines range is reasonable." *Id.* at 50 (citing *Rita v. United States*, 551 U.S. 338, 351 (2007)). Rather, the Court "must make an individualized assessment based on the facts presented." *Id.*; *United States v. Carter*, 564 F.3d 325, 330 (4th Cir. 2009) ("Regardless of whether the district court imposes an above, below, or within-Guidelines sentence, it must place on the record an 'individualized assessment' based on the particular facts of the case before it.") (quoting *Gall*, 552 U.S. at 50-52).

This Court may consider a wide variety of information during a sentencing proceeding. *See Alleyne v. United States*, 133 S. Ct. 2151, 2163 n.6 (2013) ("[J]udges may exercise sentencing discretion through 'an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come.'") (alteration in original) (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972)); *United States v. Helton,* 782 F.3d 148, 151-52 (4th Cir. 2015). This Court possesses "extremely broad discretion when determining the weight to be given each of the § 3553(a) factors," *United States v. Jeffery*, 631 F.3d 669, 679 (4th Cir. 2011), and may accord more weight to mitigating or aggravating factors. *United States v. Rivera-Santana,* 668 F.3d 95, 105 (4th Cir. 2012). So long as the court properly justifies its weighing of the factors, a substantial variance from the guidelines range is reasonable. *United States v. Hernandez-Villanueva,* 473 F.3d 118, 123 (4th Cir. 2007). Although the district court "must ensure that its justification supports 'the degree of the variance,'" it need not make "a finding of 'extraordinary' circumstances" in order to impose a sentence outside the defendant's Guidelines range. *United States v. Evans*, 526 F.3d 155, 161 (4th Cir. 2008) (quoting *Gall*, 552 U.S. at 47). A sentence below a properly calculated

Guidelines range is presumed to be substantively reasonable. *United States v. Vinson*, 852 F.3d 333, 357 (4th Cir. 2017).

Jolen recognizes that he seeks a substantial variance from the guidelines range. Even major variances, however, are within this Court's discretion. When the district court imposes a sentence outside the Guidelines range, "it must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Provance*, 944 F.3d 213, 217 (4th Cir. 2019) (internal quotation marks omitted). "A major [variance] should be supported by a more significant justification than a minor one." *United States v. Morace*, 594 F.3d 340, 346 (4th Cir. 2010) (quoting *Gall,* 552 U.S. at 50). The Fourth Circuit "will generally find a variance sentence reasonable when the reasons justifying the variance are tied to § 3553(a) and are plausible." *Provance*, 944 F.3d at 217 (internal quotation marks omitted). The appellate court will accord "due deference to the district court's decision that the [18 U.S.C.] § 3553(a) factors, on a whole, justify the extent of the variance." *United States v. Zuk*, 874 F.3d 398, 409 (4th Cir. 2017) (internal quotation marks omitted). Examples of such deference include:

- *United States v. Collins,* 982 F.3d 236, 244 (4th Cir. 2020) (affirming variance from guidelines range of 27-33 months to sentence of 60 months);

- *United States v. Cason,* 2022 WL 989377 (4th Cir. Apr. 1, 2022) (per curiam) (affirming variance from guidelines range of 135-147 months to sentence of 276 months);

- *United States v. Robertson,* 856 F. App'x 432, 437-38 (4th Cir. 2021) (per curiam) (affirming variance from guidelines range of 235-293 months to sentence of 480 months);

- *United States v. Armstrong,* 691 F. App'x 719, 720 (4th Cir. 2017) (per curiam) (affirming upward variance of more than three times the top of the advisory guidelines range);

- *United States v. McReynolds,* 442 F. App'x 772, 773 (4th Cir. 2011) (per curiam) (same);

- *United States v. Murel,* 502 F. App'x 291, 295 (4th Cir. 2012) (per curiam) (affirming downward variance from guidelines range of 235-293 months to sentence of 192 months);

- *United States v. Kalchstein,* 388 F. App'x 350, 352 (4th Cir. 2010) (per curiam) (affirming upward variance of more than five times the top of the advisory guidelines range).

Jolen seeks a variance from a guidelines range of 70-87 months (offense level 21, criminal history category V) to a range of 12-18 months. A variance of 58 months (from 70 months to 12 months plus one day) is smaller than the variances the Fourth Circuit affirmed in many of the cases discussed above. Such a variance would be justified, plausible, and consistent with the fact that the accessory-after-the-fact cross-reference, while literally applicable, results in an absurdly high guidelines range, even if the Court grants the requested downward departure. And it would be consistent with Jolen's status as a victim of the kidnapping and assault, and with the substantial assistance he provided to the government in the prosecution of the first four kidnappers and the initial portion of the Sherman case.

1. **Nature and Seriousness of the Offense and History
and Characteristics of the Defendant — Including Cooperation**

Jolen recognizes the seriousness of his offense. He understands that there was no justification for proposing to withhold truthful testimony about the kidnapping and assault or to

seek financial gain from doing so. He also asks the Court to take into account that while his strategy for addressing his fears about testifying against Sherman was inexcusable, his concern for his safety was well-founded, as demonstrated by the stipulated facts in this case and in the kidnapping cases.

Jolen's history and personal characteristics are a jumble of contradictions. He is intelligent, personable, and hard-working, as demonstrated by his long history of gainful employment in Virginia and Florida. At the same time, he has a lengthy criminal history in the Virginia state courts, much of it attributable to his inability to maintain sobriety. As Jolen's record of alcohol and drug-related charges indicates, while he has periodically successfully completed treatment programs, he has struggled to maintain a sober lifestyle. In 2020, Living Free Health Services once again diagnosed him as suffering from Alcohol Use Disorder-Severe (ICD-10 Code F10.20) under the criteria in the Diagnostic and Statistical Manual of Mental Disorders (DMS-V). *See* Ex. 11. In 2021, his Fairfax County probation officer accurately summarized Jolen's contradictions when she wrote that he "has obtained his barber's license, which is a positive accomplishment he had been working on for well over 2 years. Mr. Ghorbani does have an alcohol addiction and has not taken his sobriety seriously." *See* Ex. 12 at JG_13835. Alcohol clearly played a significant role in the idiotic communications that led to the current conviction. Anxious about testifying, Jolen consumed more and more alcohol. The alcohol, in turn, made his anxiety worse. As articles from the National Library of Medicine make clear, "[a]lcoholics frequently experience episodes of intense depression and/or severe anxiety,"[2]

---

[2] M. Schuckit, "Alcohol, Anxiety, and Depressive Disorders," National Library of Medicine, National Center for Biotechnology Information, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6876499/pdf/arhw-20-2-81.pdf (last visited Feb. 17, 2023).

and "panic disorder typically has a relatively large association with AUDs [alcohol use disorders]."[3] The PSR, Jolen's own letter to the Court, and the letters from his family and friends make clear the dominant role that substance abuse has played in all of his criminal conduct, past and present. *See* Ex. 1.

In considering Jolen's history and characteristics, the Court also has the discretion to take into account his cooperation in the kidnapping case. Section 3553(a)(1) instructs a sentencing court to consider the "history and characteristics of the defendant," without limitation. "This sweeping provision presumably includes the history of a defendant's cooperation and characteristics evidenced by cooperation." *United States v. Fernandez,* 443 F.3d 19, 33 (2d Cir. 2006). Similarly, 18 U.S.C. § 3661 provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Even though this case does not fall neatly within § 5K1.1 and the government does not give Jolen credit for cooperation, the Court may consider all of a defendant's relevant conduct, including attempts to cooperate that the government foreclosed. *See United States v. Robinson,* 741 F.3d 588, 600 (5th Cir. 2014); *United States v. Landron-Class,* 696 F.3d 62, 77-78 (1st Cir. 2012); *United States v. Massey,* 663 F.3d 852, 858 (6th Cir. 2011); *United States v. Leiskunas,* 656 F.3d 732, 737 (7th Cir. 2011); *United States v. Doe,* 398 F.3d 1254, 1260–61 (10th Cir. 2005); *Fernandez,* 443 F.3d at 33; Hutchison, et

---

[3]     J. Smith and C. Randall, "Anxiety and Alcohol Use Disorders: Comorbidity and Treatment Considerations," National Library of Medicine, National Center for Biotechnology Information https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3860396 (last visited Feb. 17, 2023).

al., *Federal Sentencing Law and Practice* § 5K1.1, cmt. 2 n.3 (2012) (noting that although a court may not grant a downward departure for substantial assistance without a motion from the government, "[p]ost-*Booker* … sentencing courts may weigh a defendant's assistance *or attempts to assist* the government as part of the § 3553(a) analysis and *vary* from the Guidelines if appropriate")(emphasis added).

### 2.      Deterrence

Jolen understands that the Court must impose a sentence that deters victim-witnesses in criminal cases from considering selling their testimony, either to avoid the challenges or testifying or to obtain things of value. The circumstances of this case are so unusual, however, that a sentence below the guidelines range, but involving more than a year of incarceration, is sufficient to accomplish that goal.

### 3.      Protecting the Public from the Defendant

Jolen's offense of conviction was an offense against the administration of justice, not any particular member of the public. He has been amply deterred from committing any further crimes of this nature. To the extent the public requires protection from Jolen's abuse of alcohol and controlled substances, determination of the appropriate sanctions should be left to the judges in Fairfax County who have handled offenses related to those issues and supervised his probation.

### 4.      Educational and Vocational Training and Medical Care

Jolen is a licensed barber and has received the training required for food service. He does not require a lengthy period of education or training by the Bureau of Prisons, but does request that the Court recommend that, if he qualifies, the Bureau of Prisons place him in a Residential Drug Abuse Program ("RDAP").

5. **Avoiding Unwarranted Sentence Disparities with Other Obstruction of Justice Defendants — and with the Kidnapping Conspirators**

Many defendants sentenced for crimes such as those Jolen committed receive sentences outside the guidelines range. For example, for offenses involving administration of justice during Fiscal Year 2021, courts granted downward variances with a mean decrease of 69.2 percent and a median decrease of 78.4 percent.[4] The mean and median sentence lengths for administration of justice offenses were 13 and 8 months, respectively; the mean and median lengths for sentences of imprisonment for such offenses were 17 and 12 months, respectively.[5] A substantial percentage — 27.5 percent — of defendants who committed offenses involving administration of justice received sentences involving probation and alternatives or probation only.[6]

Moreover, a sentence within the Guidelines would result in Jolen receiving a very similar sentence to the persons who kidnapped and assaulted him: Anthony Erik Hebron (168 months); Darius Lawrence Young (156 months); Tray David Sherman (126 months); Christopher Allen Young (126 months); and Lamar Jamal Perkins (120 months). Even if Jolen were actually an "accessory after the fact," such a result would be manifestly unfair.

---

[4] *See* U.S. Sentencing Comm'n, "Extent of Downward Variances for Type of Crime," Fiscal Year 2021 data, Table 40, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2021/Table40.pdf (last visited Feb. 24, 2023).

[5] *See id.,* "Sentence Imposed by Type of Crime," Fiscal Year 2021 data, Table 15, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2021/Table15.pdf (last visited Feb. 24, 2023).

[6] *See id.,* "Sentence Type by Type of Crime," Fiscal Year 2021 data, Table 13, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2021/Table13.pdf (last visited Feb. 24, 2023).

Jolen is not asking the Court for a sentence of probation. What he is asking is for a sentence that reflects what he really did — obstruct the prosecution of Mr. Sherman — rather than a sentence that is based on the legal fiction that he was an accessory after the fact to his own kidnapping and pistol-whipping. He respectfully submits that a sentence of imprisonment for a year and a day would be such a sentence.

## IV. RECOMMENDATION AND CONCLUSION

At the age of 29, Jolen Ghorbani has made more foolish mistakes than some people make in a lifetime. Regardless of the unique and mitigating circumstances, his mistake in this case — unquestionably one of the strangest cases ever prosecuted in the Greenbelt courthouse — was a serious offense against the administration of justice that needs to be punished appropriately. But Jolen should be punished for what he did, not for what Sherman and his conspirators did to him. "The principle that punishment should fit the crime 'is deeply rooted and frequently repeated in common-law jurisprudence.'" *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 575 n.24 (1996) (quoting *Solem v. Helm,* 463 U.S. 277, 284 (1983)). For all the reasons stated, the punishment that fits Jolen's crime is a sentence of one year and one day of imprisonment.

Respectfully submitted,

/s/ Stuart A. Berman
Stuart A. Berman (Bar No. 08489)
Lerch Early & Brewer, Chtd.
7600 Wisconsin Avenue, Suite 700
Bethesda, Maryland 20814
T: (301) 657-0729
F: (301) 347-1538
saberman@lerchearly.com
Counsel for Jolen Michael Ghorbani

Dated: February 17, 2023

## CERTIFICATE OF SERVICE

I certify that on February 17, 2023, I served the foregoing sentencing memorandum via CM-ECF, which will send the notification of such filing to all counsel of record. I further caused hard copies to be hand-delivered to the Clerk and to:

Jeffrey J. Izant
Assistant United States Attorney
U.S. Courthouse, Suite 200
6500 Cherrywood Lane
Greenbelt, Maryland 20770
jeffrey.izant@usdoj.gov

Mr. Edwin Encarnacion
U.S. Probation Officer
U.S. Probation and Parole Office
7855 Walker Drive, Suite 600
Greenbelt, Maryland 20770
edwin.encarnacion@mdp.uscourts.gov

/s/ Stuart A. Berman
Stuart A. Berman (Bar No. 08489)
Lerch Early & Brewer, Chtd.
7600 Wisconsin Avenue, Suite 700
Bethesda, Maryland 20814
T: (301) 657-0729
F: (301) 347-1538
saberman@lerchearly.com
Counsel for Jolen Michael Ghorbani