**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. GJH-22-361** |
| | * | |
| **JOLEN MICHAEL GHORBANI,** | * | |
| a/k/a "Jay," | * | |
| a/k/a "jayz_cutz93," | * | |
| a/k/a "jayfaded93," | * | |
| | * | |
| **Defendant** | * | |
| | ******* | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The Defendant, Jolen Michael Ghorbani, was the victim of a violent, multi-defendant kidnapping conspiracy that was quickly uncovered by federal law enforcement agents. To vindicate the Defendant's rights, and to protect the community from further violence, the government prosecuted each of the Defendant's five kidnappers. In short, the government employed the criminal justice system to keep the Defendant safe. The Defendant, however, tried to exploit the criminal justice system for his financial benefit. As the Defendant has now admitted, the Defendant attempted to extort one of the kidnappers into paying the Defendant $5,000 in exchange for the kidnapper's freedom, which the Defendant intended to deliver by perjuring himself. In doing so, the Defendant seriously jeopardized the government's ability to successfully prosecute the kidnapper. And the Defendant also betrayed an immense disdain for the very system that the government was trying to use to protect the Defendant. To vindicate the integrity of the criminal justice system, and achieve the other sentencing goals set forth in 18 U.S.C. § 3553(a), the government requests that the Court sentence the Defendant to term of 54 months' imprisonment and three years of supervised release.

## I.  Background

### A.  The Kidnapping

On February 3, 2021, the Defendant was kidnapped during a drug transaction, which the Defendant's kidnappers exploited to commit an armed robbery, assault, and burglary.

The Defendant first met two of the kidnappers, Tray David Sherman and Anthony Erik Hebron, shortly after midnight, while the Defendant was drinking and gambling at the MGM National Harbor.  A few hours later, the Defendant agreed to supply Sherman and Hebron with an ounce of cocaine, which was worth approximately $1,600.  The Defendant believed that, in exchange for the cocaine, Sherman and Hebron would give the Defendant money and/or access to female sex workers.  At around 7:30 a.m., the Defendant agreed to get into Sherman's car and drive with Sherman and Hebron from the MGM to Washington, D.C., where the Defendant's cocaine supplier was located.  After the Defendant acquired the ounce of cocaine, Sherman and Hebron drove the Defendant to a secluded parking lot within a public housing complex located in a Southeast D.C. neighborhood known as "Simple City."  There, Darius Lawrence Young ("Mup") and Christopher Allen Young ("Young") got into Sherman's car and, along with Sherman and Hebron, assaulted the Defendant with a firearm and stole his wallet, his cellphone, and the key to the Defendant's room at the MGM.

Mup and Young then took the Defendant into a small utility closet in the basement of a nearby building, where they continued to hold the Defendant at gunpoint so that Sherman and Hebron could return to the MGM and steal valuables from the Defendant's hotel room.  Another defendant, Lamar Jamal Perkins, served as a lookout for police or other witnesses.  After Sherman and Hebron finished burglarizing the Defendant's hotel room, approximately two hours after the Defendant had been taken captive, Young and Mup released him.  By that point, law enforcement officers—having overheard some of the kidnappers' communications occurring over Mup's

cellphone, which was being intercepted in an unrelated drug investigation—had spread out across Simple City to search for a possible kidnapping victim. When officers encountered the Defendant, only a few minutes after he was released, blood was still running down the Defendant's face from a wound on his forehead.

## B.     The Defendant's Attempts to Obstruct Justice

On March 31, 2021, a grand jury in the District of Maryland returned an Indictment charging Sherman, Hebron, Young, Mup, and Perkins with conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201(c). *See* Indictment, *United States v. Young et al.*, Crim. No. GJH-21-80 (D. Md.), ECF 30. Between March 31 and May 16, 2021, each of the kidnappers was arrested and detained pending trial. And, between May 16, 2021, and April 13, 2022, each of the kidnappers—except Sherman—pleaded guilty to participating in the kidnapping conspiracy. Sherman's trial was then set to commence on July 11, 2022. Accordingly, on April 15, 2022, the government served the Defendant with a subpoena requiring him to testify at Sherman's trial.

At the time, the Defendant was living in Virginia. The Defendant had also obtained a new cellphone and number, since the kidnappers had stolen the cellphone that the Defendant had during the kidnapping. On May 10, 2022, the government met with the Defendant and his attorney in Virginia to discuss the trial and the Defendant's rights under the Crime Victim Rights Act. During the meeting, the government updated the Defendant on the status of the prosecution, including the pleas entered by Sherman's coconspirators and the sentences the Court had imposed. The government also described the plea agreement that the government had offered Sherman, which would have resulted in Sherman's incarceration for at least ten-and-a-half years. The government reminded the Defendant that, if Sherman rejected the offer, the government would call the Defendant to testify at Sherman's trial.

When the Defendant expressed apprehension about testifying at trial, the government outlined all the steps that law enforcement would take—and had routinely taken in numerous other cases—to protect the Defendant's safety as a government witness. After the Defendant rejected the constraints of the Witness Protection Program, the government explained that, as an alternative, it could potentially assist the Defendant with relocation. The Defendant expressed interest in relocation and the government agreed to explore whether and to what extent it could provide relocation assistance.

By May 27, 2022, however, the Defendant moved on his own accord from Virginia to Florida. On June 5, 2022—roughly one week after the Defendant had relocated to Florida, and five weeks before Sherman's trial was set to commence—the Defendant sent Sherman a series of intimidating and threatening messages to Sherman's Instagram account. The Defendant wrote, "Goofy nigga 🤡🤡🤡 Plead out take that 10 piece like a man. Lol your [sic] gonna sit in Prison next decade". The Defendant added emojis expressing a face holding back tears, faces that were freezing cold, and three popping champagne bottles. Then, the Defendant sent Sherman his new, post-kidnapping phone number—which the government had never disclosed to Sherman in discovery—and added, "[C]all me If you want to finesse trial".

Three days later, on June 8, 2022, the government—unaware of the Defendant's messages to Sherman—contacted the Defendant by phone. The government advised the Defendant that Sherman had rejected the government's plea offer and was proceeding to trial. The Defendant notified the government that he had already relocated to Florida but was nonetheless interested in whatever relocation assistance the government could still provide. The government expressed approval of the Defendant's decision to relocate to Florida and explained that it believed the Defendant would be safe living there. The government also advised the Defendant that it was

likely to have funds available for witness relocation assistance but explained that it could not yet confirm how much funding would be made available.[1]

The next day, June 9, 2022, Witness 1—whom Sherman had authorized to access his Instagram account—told Sherman about the messages the Defendant had sent. Sherman told Witness 1 that he believed he knew who had sent them and directed Witness 1 to respond that he (Sherman) was "going to trial"—*i.e.*, that he was not going to plead guilty. Witness 1 subsequently complied with Sherman's instruction and, on June 11, used Sherman's Instagram to respond to the Defendant, "He going to trail [sic]."

Four days later, on June 15, 2022, the government—still unaware of the Defendant's messages to Sherman—contacted the Defendant to schedule a meeting to prepare the Defendant to testify at Sherman's trial. Because the Defendant did not have access to a computer to participate in a video conference, the government arranged to have the prosecution team travel to Florida. The Defendant agreed to meet the prosecution team at the U.S. Attorney's Office for the Southern District of Florida on June 21, 2022.

Between June 15 and June 21, however, the Defendant escalated his harassment of Sherman. On the morning of June 18, 2022—three days after arranging to meet the government, and three days before the meeting occurred—the Defendant replied to Sherman's Instagram message by corruptly soliciting a $5,000 payment in exchange for refusing to testify at Sherman's trial. The Defendant wrote, "How much not to testify??? 5racks?? Either you cough off up sum bread or sit in the feds for next 20 years . . . Your choice my boy [I don't give a fuck]". The

---

[1] On June 14, 2022, the government informed counsel for Sherman that the government had offered to assist the Defendant with relocation expenses.

Defendant added, "Swear to god not bullshitting . . . 5k crypto for your freedom my G . . . How you tryna act??"

Less than an hour later, the Defendant continued messaging Sherman in an even more menacing fashion. The Defendant wrote, "Listen you goofy fuck nigga!!!! Fuck simple city your bitch ass not coming home till your [sic] 40 years old". Again, the Defendant tried to extort Sherman into paying the Defendant $5,000 to testify falsely at Sherman's trial, writing, "Your trial this month if you want me to forget who you were that morning or how you look". The Defendant continued, "You gonna shoot sum racks . . . 5 sounds wholesome . . . [a]nd that's it." Alongside crying laughing and facepalm emojis, the Defendant wrote, "You might walk from the trial [a] free man . . . [o]r sit for next 20 years that's all on you my boy."

As the Defendant was writing these messages to Sherman, Witness 1 was logged into Sherman's Instagram account on Witness 1's cellphone. Witness 1 immediately captured screenshots of the Defendant's messages and, within minutes, sent them to an investigator working on behalf of Sherman's defense counsel. Although Sherman's counsel was under no obligation to produce the Defendant's messages to the government prior to Sherman's trial, Sherman's counsel ultimately disclosed them to the government on June 30, 2022.

In the meantime, the prosecution team traveled to Florida and met with the Defendant on June 21, 2022, less than three weeks before Sherman's trial. The prosecution team reviewed the government's trial exhibits with the Defendant and prepared the Defendant to testify. After reviewing his trial testimony, the Defendant asked again about relocation assistance. The prosecution team explained that the government would be willing to provide relocation assistance in the range of $5,000 to $15,000. The prosecution team clarified, however, that the amount of assistance provided would depend on a later assessment of witness security concerns, which would

depend on *whether* the Defendant testified at a trial. But the prosecution team emphasized that it would not depend on *how* the Defendant testified.

On June 30, 2022—nine days after the government's meeting with the Defendant and ten days before Sherman's trial—Sherman's counsel produced screenshots of the Defendant's Instagram messages to the government, rather than surprising the government with the messages at trial. After learning about the messages, the government extended a new plea offer to Sherman, who accepted the offer and entered a guilty plea the following day, July 1, 2022.[2] The government then began investigating the Defendant for bribery and obstruction of justice.

### C. The Defendant's Prosecution

On October 19, 2022, a federal grand jury for the District of Maryland returned an Indictment charging the Defendant (in Count One) with attempted witness bribery, in violation of 18 U.S.C. § 201(b)(4), and (in Counts Two and Three) obstruction of justice, in violation of 18 U.S.C. § 1503(a). *See* ECF 1. Based on the grand jury's indictment, the Court issued a warrant for the Defendant's arrest. On October 25, 2022, the Defendant was arrested without incident in Fort Lauderdale, Florida. The Defendant was then transported to the FBI's Fort Lauderdale office for booking and a custodial interview.

At the beginning of the interview, which was video recorded, the Defendant was advised of his *Miranda* rights both verbally and in writing. The Defendant then voluntarily waived his rights, executed a written *Miranda* waiver form, and agreed to be interviewed. An officer then showed the Defendant screenshots of the Instagram messages that the Defendant had sent to Sherman and asked whether the Defendant had sent them. In response, the Defendant said, "I fucked up." The Defendant added, "I was drunk, I just wasn't thinking, and I made a mistake. I'll

---

[2] On January 20, 2023, the Court sentenced Sherman to 126 months' imprisonment.

man up to that." When the officer sought to clarify that the Defendant was admitting that he sent the messages, the Defendant stated, "I don't want to say that I sent them."

Nonetheless, the Defendant explained, "In my head, I was like, I don't want to fly up to D.C. and testify. So I did some stupid shit so I didn't have to testify." The Defendant added that he had located Sherman's account on Instagram by searching for "Simple City," which he did "to do my research"—*i.e.*, to locate and identify his kidnappers. The officer then asked the Defendant if he wanted the government to know anything else about what he did. Referring to himself, the Defendant responded, "Just say he was drunk and he didn't want to testify." When an officer later paged through the screenshots, the Defendant added, "Look, you could tell I was drunk. See the way I'm talking there? Like, I was drunk, bro, I was just talking shit, like liquid courage. But there wasn't no, like, malice." Attempting to minimize his conduct, the Defendant claimed that he "just rambled off some dumb shit." The Defendant added, "The best angle that I'm going to work is that I didn't want to testify, so I did some goofy shit."

The Defendant subsequently made his initial appearance, consented to pretrial detention, and was transported from Florida to the District of Maryland. On January 12, 2023, the Defendant appeared before the Court and pled guilty to Count One of the Indictment, charging the Defendant with attempted witness bribery, in violation of 18 U.S.C. § 201(b)(4). The Defendant entered his plea pursuant to an agreement with the government under Federal Rule of Criminal Procedure 11(c)(1)(B). *See* ECF 23. In the agreement, the Defendant acknowledged that his conviction under 18 U.S.C. § 201(b)(4) carries a maximum sentence of 15 years' imprisonment and 3 years of supervised release. *See id.* ¶ 3. The Defendant also agreed to a detailed stipulation of facts, which include many of the details described above. *See* ECF 23-1.

Based on the stipulated facts, the parties have reached an agreement on certain applicable guidelines factors. First, the parties agree that, pursuant to U.S.S.G. §2J1.3(c)(1), the applicable base offense level is determined by reference to §2X3.1 because the offense involved witness bribery in respect to a criminal offense. *See* ECF 23 ¶ 6.a. Second, the parties agree that, pursuant to §2X3.1(a)(1), the base offense level is 6 levels lower than the offense level for the underlying offense. *See id.* ¶ 6.b. Third, the parties agree that, pursuant to §2A4.1(a) and §2A4.1(b)(3), the offense level for the underlying offense is 34, because the offense was kidnapping and a dangerous weapon was used. *See id.* ¶ 6.c. The parties, therefore, agree that the Defendant's adjusted offense level is 28. *See id.* ¶ 6.d. The government also does not oppose a further 2-level reduction pursuant to §3E1.1(a), based on the Defendant's prompt recognition and affirmative acceptance of responsibility for criminal conduct. In addition, the government will make a motion pursuant to §3E1.1(b) for an additional 1-level decrease in recognition of the Defendant's timely notification of his intention to enter a guilty plea.

Accordingly, the parties agreed that the Defendant's final adjusted offense level would be—at most—25. The PSR prepared by the U.S. Probation Office reaches the same conclusion. *See* Expedited Presentence Investigation Report ("PSR") ¶ 35, ECF 26. The Defendant, however, also reserved the right to advocate for a further 4-level downward departure pursuant to §5K2.0(a)(2)(B), which provides that a guidelines departure "may be warranted in the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." *See* ECF 23 ¶ 7. The government disagrees that §5K2.0(a)(2)(B) warrants a downward departure in this case.

The guidelines properly link the offense level for witness bribery in connection with a criminal case to the offense level of the offense at issue in the criminal case, at least where the

offense level is greater than 14. *See* U.S.S.G. §2J1.3(c)(1). Attempting to bribe a witness in a criminal case is more culpable conduct when the underlying crime is more severe. Kidnapping is an extremely serious offense, and armed kidnapping is even more serious. *See id.* §2A4.1(b)(3). Moreover, because obstructing justice in a criminal case potentially prevents the criminal justice system from holding the principal accountable, a person who attempts to obstruct justice in a criminal case can sometimes be just as culpable as an accessory-after-the-fact. *See id.* §2J1.4 cmt. app. n. (background).

At the same time, the guidelines also properly apply a 6-level downward departure because a person who obstructs justice in a criminal case is usually not as culpable as the person who commits the underlying crime. But a further downward departure merely because the person who obstructed justice was a victim of the crime is unwarranted. With respect to the harm caused— jeopardizing the justice system's ability to hold a violent criminal accountable—the specific identity of the person obstructing justice is irrelevant. Nor is the Defendant's identity as a crime victim dispositive on the question of culpability from a sentencing guidelines perspective. Crime victims are usually the most important witnesses; sometimes, they are the *only* witnesses to crime. Accordingly, a victim's obstructive conduct can have an even more negative effect on the justice system's ability to hold criminals accountable than non-victim witnesses. And, insofar as the Defendant argues that his conduct should be excused because it was motivated by fear (an argument addressed below), crime victims are—unfortunately—not alone in their vulnerability to intimidation. Witnesses who are not victims, too, are exposed to this reality.

In any event, the government respectfully submits that the Court need not decide whether such a departure is warranted because the government is requesting that the Court vary downward from the guidelines pursuant to 18 U.S.C. § 3553(a). *See* Fed. R. Crim. P. 32 (i)(3)(B) (authorizing

Court to determine that ruling on "controverted matter" is "unnecessary" when "the matter will not affect sentencing").[3]  Because the Defendant is in criminal history category V, *see* PSR ¶ 52, the Defendant's guidelines range is either 100 to 125 months' imprisonment (applying offense level 25), or 70 to 87 months' imprisonment (applying offense level 21).  *See* U.S.S.G. Ch. 5, pt. A, table.  In either case, the government's requested term of imprisonment, 54 months, is below the low-end of the guidelines range.

## II.     Section 3553(a) Analysis

Even though it represents a downward variance, a 54-month prison sentence is sufficient but not greater than necessary to achieve the sentencing goals set forth in 18 U.S.C. § 3553(a)(2), considering the nature and circumstances of the offense and the Defendant's history and characteristics, *see id.* § 3553(a)(1).

### A.     The Need for the Sentence to Reflect the Seriousness of the Offense, and to Promote Respect for the Law

The need for the sentence imposed to reflect the seriousness of the offense and to promote respect for the law both support the imposition of a 54-month term of imprisonment.  *See* 18 U.S.C. § 3553(a)(2)(A).

---

[3] It is also unclear what standard the Court should apply in determining the applicability of a departure pursuant to §5K2.0(a)(2)(B).  In 1996, the Fourth Circuit articulated a five-factor test for determining when the sentencing court may depart from the guidelines.  *See United States v. Rybicki*, 96 F.3d 754, 757–58 (4th Cir. 1996).  But the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), called into question whether *Rybicki* was still good law, and the Fourth Circuit has expressly declined to address the matter.  *See United States v. Rivera-Santana*, 668 F.3d 95, 102 (4th Cir. 2012); *but see United States v. Ruhbayan*, 527 F.3d 107, 118–19 (4th Cir. 2007) (evaluating district court's application of *Rybicki* factors without addressing *Rybicki*'s viability post-*Booker*), *vacated on other grounds*, 552 U.S. 1163 (2008); *United States v. Hernandez-Montealegre*, 445 F. Supp. 2d 646, 650–51 (E.D. Va. 2006) (holding that *Booker* did not affect *Rybicki*'s framework for analyzing guidelines departures).  This is yet another reason why it may be appropriate for the Court to decline to address the issue under Fed. R. Crim. P. 32(i)(3)(B).

1. <u>Reflecting the Seriousness of the Offense</u>

The Defendant's offense was, of course, serious. Indeed, it represented an assault on the integrity of the criminal justice system itself. The Defendant tried to leverage his status as a trial witness to extort a $5,000 payment from a criminal defendant. In exchange, the Defendant offered to commit perjury at that defendant's trial. Even though the Defendant's efforts to extort Sherman were not ultimately successful, the attempt alone was enough to potentially damage the government's case. Because it revealed the Defendant as a person who was willing to put his testimony up for sale, it seriously altered the government's ability to elicit testimony from a central witness at the kidnapping trial. Accordingly, the Defendant's conduct jeopardized the prosecution's ability to hold Sherman accountable for the armed kidnapping that had so severely harmed the Defendant himself.

Insofar as the Defendant tries to minimize his culpability by claiming that he acted out of fear, the Court should reject the *ex-post* mitigation effort because it is inconsistent with the evidence. The Defendant's messages to Sherman did not convey fear; they were intimidating and demeaning. Laughing that Sherman would "sit in Prison next decade," the Defendant taunted Sherman with popping champagne bottles and sarcastic teary-eyed and freezing emojis. The Defendant referred to Sherman using racial slurs. Addressing Sherman as "you goofy fuck nigga," the Defendant told Sherman, "Fuck simple city your bitch ass not coming home till your [sic] 40 years old". And, when the Defendant reminded Sherman that he might "sit for next 20 years," the Defendant accompanied the message with a crying laughing emoji.

The circumstances of the Defendant's conduct also undermine any suggestion that the Defendant was afraid of Sherman. By messaging Sherman at all, the Defendant revealed his Instagram account to Sherman, which would have given Sherman access to the Defendant's

personal photographs, videos, and other identifying information. The Defendant did so, moreover, at the same time the government was advising the Defendant to keep any social media accounts private to safeguard his identity and whereabouts. And not only did the Defendant disclose his personal Instagram account, but the Defendant also gave Sherman his new personal cellphone number and invited Sherman *to call him*. The Defendant did so notwithstanding that fact that the Defendant had obtained the new number *because of* the kidnapping committed by Sherman and his coconspirators. This is not behavior consistent with fear.

In fact, as the Defendant was messaging Sherman on June 18, 2022, the Defendant *affirmatively told* Witness 2 that he was not afraid. When Witness 2 suggested that the kidnappers wouldn't "let [the Defendant] go," even if the Defendant testified falsely, the Defendant responded, "Fuck them . . . DC niggas . . . Not like they organize[d] crime." Mem. in Supp. of Gov't Mot. for Pretrial Detention at 11, ECF 13. In other words, the Defendant believed that Sherman was not part of a sophisticated organization that had the ability to engage in retaliation outside the confines of Simple City. And the Defendant emphasized to Witness 2, "I'm in Florida," where—the government had just assured him—the Defendant would be safe. *Id.* In truth, the evidence shows that the Defendant's motives for the offense were making money and exacting revenge. As the Defendant explained to Witness 2, the Defendant was "[j]ust tryna make sum bread." *Id.* Even when Witness 2 advised the Defendant to "[u]nsend the messages," the Defendant responded, "Fuck it tryna milk this." *Id.* at 15. Referring to Sherman, the Defendant added, "5 bands for his freedom" and "Fuck [h]im". *Id.*

Indeed, the Defendant began to change his story about his motive only when he got caught. Even though the Defendant sent multiple sets of messages across nearly two weeks, and sent the June 18 messages between 8:00 a.m. and 9:15 a.m., the Defendant told an interviewing officer that

he only sent the messages because he was drunk and had "liquid courage." The Defendant even acknowledged that he was concocting an after-the-fact explanation for his conduct. During his post-*Miranda* interview, the Defendant stated that "the best angle" he was "going to work" was that he "didn't want to testify," so he did "some goofy shit." In reality, the evidence shows that the Defendant's conduct was less the product of fear and more the result of his attempt to exploit a very unusual situation for profit and retribution.

2.     Promoting Respect for Law

The Defendant's willingness to exploit criminal justice system likewise underscores the need for the Court's sentence to promote respect for law. Indeed, the defining feature of the Defendant's offense was his disrespect for the criminal justice system. The Defendant believed that his status as a witness entitled him to usurp the power of the jury and judge to determine guilt and punishment. As the Defendant told Sherman, "5k crypto for your freedom my G." The Defendant also treated his sworn oath to testify truthfully as a bargaining chip to be deployed for private financial gain. And the Defendant tried to use it as leverage to extort $5,000 from a criminal defendant facing a significant prison term.

The way the Defendant described his own conduct further betrayed his disdain for the judicial process. The Defendant casually explained to Witness 2 that he was "auctioning off [Sherman's] freedom." ECF 13 at 9. A person's liberty was at stake, but to the Defendant, it was just about "tryna make sum bread." *Id.* at 11. The Defendant even acknowledged that his conduct was wrong but that he was doing it anyway. The Defendant admitted to Witness 2 that he knew he was "playing with fire" just by messaging Sherman. *Id.* Yet when Witness 2 told the Defendant to unsend the messages because he didn't know "how lawyers will look at that," the Defendant's responded, "Fuck it tryna milk this." *Id.* at 15.

The foregoing messages with Witness 2, moreover, were not the only evidence of the Defendant's lack of respect for law. The Defendant also told Witness 2 that he was planning to buy a "strap"—*i.e.*, a firearm—even though the Defendant knew that he was a prohibited person. Witness 2 reminded the Defendant, "You don't need the strap . . . If you get you'll be in more trouble." *Id.* at 11. Acknowledging that it would be illegal for him to possess a firearm, the Defendant stated that he would keep the weapon at home, reasoning that he would only be in trouble "if caught." *Id.* at 12. The Defendant's willingness to purchase and keep a firearm despite expressly acknowledging that it was illegal for him to do so not only manifests a genuine disrespect for law but also indicates that his conduct in this case is not an aberration but a feature of his character.

The Defendant's criminal history, which includes a prior charge for bribery, only underscores this point. According to an incident report, on September 28, 2020, the Defendant was arrested for being drunk in public and asked the officer how they could "make this go away." PSR ¶ 49. When the officer asked the Defendant to clarify what he meant, he asked the officer, "What can we do to make this go away? 400? 500?" *Id.* The Defendant even offered the officer access to fentanyl dealers to make the charge disappear. *See id.* The officer twice advised the Defendant that he could not bribe the officer to prevent the arrest for drunk in public. *See id.* And after the officer effectuated the Defendant's arrest, the Defendant later told the officer, "I'm going to slap the shit out of you." *Id.* Just like the Defendant's conviction in this case, the Defendant's prior conduct demonstrates that the Defendant viewed the criminal justice system as merely a process to be manipulated rather than an institution to be respected.

## B.    The Need to Provide Adequate Deterrence to Criminal Conduct

Imposing a 54-month prison term is also critical for affording adequate deterrence to criminal conduct, a factor that is especially meaningful in this case.  *See* 18 U.S.C. § 3553(a)(2)(B).

Given the Defendant's history of disrespect for the justice system, the need for *specific* deterrence is a highly significant factor at the Defendant's sentencing.  Not counting the Defendant's juvenile conviction (for which the Defendant was sentenced as an adult), the Defendant has sustained seven additional adult convictions in the past nine years.  These include DWI 1st Offense (October 27, 2014), Possession of a Controlled Drug (August 8, 2014), Refusal: Breathalyzer, 2nd+ Offense (November 3, 2017), Public Swearing/Intoxication (January 9, 2018), DWI: 2nd Offense Within 5 Years (April 24, 2018), DWI: 1st Offense (February 20, 2020), and Disorderly Conduct (February 19, 2021).  *See* PSR ¶¶ 42–49.  Despite this pattern of repeated criminal behavior, it appears that the Defendant was granted leniency at sentencing each time.  Since his release from juvenile confinement, the Defendant has never been sentenced to more than 14 months' imprisonment; and even that sentence was imposed not for a new criminal conviction but for violating probation in connection with a prior drug conviction.  *See* PSR ¶ 42.  While there is little question that the Defendant's substance abuse problems explain much of his criminal history, the Defendant's prior sentences have apparently been insufficiently punitive for the Defendant to gain any real respect for the justice system.  The Court's sentence must change that.

Because the Defendant's offense itself—witness bribery—threatened the integrity of the justice system, it is also critically important for the Court's sentence to promote *general* deterrence.  Put simply, the justice system relies on witnesses to tell the truth.  And every day, in courtrooms throughout this country (including in this District), everyday citizens assume this obligation—even though, sometimes (perhaps often), providing truthful testimony can be uncomfortable,

intimidating, or frightening. It is essential that witnesses nonetheless take their oaths seriously because the alternative is a system that cannot ensure that justice is done. Accordingly, the Court's sentence must send the message that the justice system takes threats to its integrity seriously, especially because prosecutions like this one are rare. And this is no less important even when, like here, a defendant's attempts to obstruct justice do not succeed. Failing to take the Defendant's conduct seriously would only encourage those who would obstruct justice to do so more carefully or persuasively in the future. That is why this Office chose to prosecute the Defendant for his conduct, even though the Defendant committed it during the prosecution of a crime in which the Defendant was the victim. In the United States, justice is not for sale to the highest bidder. Not even for victims. And the Court's sentence should make that point resoundingly clear.

### C. The Need to Protect the Public

The need for the sentence imposed to protect the public from further crimes of the Defendant likewise justifies a 54-month prison term. *See* 18 U.S.C. § 3553(a)(2)(C). In fact, the Defendant poses a danger to the public for several reasons.

The first reason is the Defendant's history of substance abuse, which is lengthy and well documented. *See, e.g.*, PSR ¶ 71–75. As described above, the Defendant's substance abuse problems have led to numerous convictions and violations of supervised release. The Defendant's abuse of controlled substances, moreover, has apparently led to the Defendant's involvement in *distributing* controlled substances. While this in no way excused or justified the conduct of the Defendant's kidnappers, the need to protect the public requires the Court to bear in mind that the Defendant was kidnapped in connection with supplying the kidnappers with an ounce of cocaine— a nontrivial amount worth approximately $1,600. And, although employment can often mitigate

the risk of committing drug offenses, that does not appear to be the case for the Defendant, who was working full-time when he was distributing cocaine to erstwhile strangers in February 2021.

The Defendant is also a danger to the public because of his interest in possessing—and ability to possess—firearms and ammunition. Although no firearms were recovered during the search of the Defendant's residence in October 2022, the Defendant's Instagram account contained messages reflecting that, in May 2021, the Defendant tried to purchase a Glock 17 or Glock 19 for approximately $800; and that, in mid-June 2022, the Defendant was planning to purchase a gun "this week." This was particularly concerning to the government in light of the Defendant's expressed willingness to engage in violence in connection with obstructing justice. In Instagram messages sent on June 18, 2022, the Defendant explained to Witness 2 that, if the Defendant's brother or friend were ever facing prison time as significant as that faced by the Defendant's kidnappers, the Defendant, "would contemplate making a nigga disappear."

And, not only has the Defendant talked about committing violence, but the Defendant also appears to have engaged in it, as recently as the days before his arrest in this case. In connection with the Defendant's arrest, law enforcement seized the Defendant's cellphone—the same one the Defendant had instructed Sherman to call to "finesse" trial. Upon executing a search warrant for the phone, the FBI discovered an iMessage conversation between the Defendant and his mother that had occurred the day before his arrest. The conversation, excerpted below, suggested that the Defendant had recently strangled his mother—and that he had no remorse about doing it.

| Sender | Recipient | Date/Time | Message |
|---|---|---|---|
| Defendant | Mother | 10/24/2022 1:38:52 p.m. | Have [Defendant's brother] call me |
| Mother | Defendant | 10/24/2022 1:43:23 p.m. | I'm not talking to you since you put your hands on me & choked me. |

| Sender | Recipient | Date/Time | Message |
|--------|-----------|-----------|---------|
| Defendant | Mother | 10/24/2022 1:44:51 p.m. | Just have [Defendant's brother] call me |
| Defendant | Mother | 10/24/2022 1:47:58 p.m. | Can you send me his number Jesus Christ |
| Defendant | Mother | 10/24/2022 1:48:11 p.m. | Cmon [Defendant's mother] you gonna [b]e angry and miserable the rest of your life |
| Mother | Defendant | 10/24/2022 1:49:05 p.m. | Stop fuckin putting your hands on me! I have a call into your PO. Enough is enough!! |
| Defendant | Mother | 10/24/2022 1:49:25 p.m. | Ok |
| Defendant | Mother | 10/24/2022 1:49:36 p.m. | Just stay away from me I want nothing to do with you |
| Mother | Defendant | 10/24/2022 1:53:59 p.m. | Likewise! I'm fed up with you physically assaulting me! |
| Defendant | Mother | 10/24/2022 1:54:17 | Text me his fucking number [Defendant's mother]!!!! |
| Mother | Defendant | 10/24/2022 2:00:11 p.m. | I'm not doing jack shit for you asshole! |
| Defendant | Mother | 10/24/2022 3:00:13 p.m. | Ok |

Finally, the Defendant's criminal history establishes that this is not a case where supervised release can adequately substitute for imprisonment. Not only was the Defendant on supervision at the time of his offense in this case, but the Defendant also has violated his release conditions at least four times during his eight consecutive years on probation. *See* PSR ¶ 42, 44. Aside from the *number* of violations, the *nature* of the Defendant's recent noncompliance with release conditions is especially alarming. According to a Fairfax County probation report dated February 8, 2021, the Defendant was instructed to find a new residence when he was showing signs of drug/alcohol relapse and exhibiting threatening behavior. *See* ECF 13-2 at 1. An addendum dated March 17, 2021, noted that the Defendant had an alcohol addiction and had "not taken his sobriety seriously." Due to the Defendant's continued arrests and convictions, his

probation officer was "concerned about [the Defendant]'s alcohol consumption, his safety and the safety of the community." The officer noted the Defendant was being supervised "at the highest level of supervision" and that the Defendant had nonetheless "continue[d] to reoffend." *See* ECF 13-3 at 1. And a further addendum dated April 5, 2021, revealed that the Defendant had threatened his mother with a knife, possessed alcohol and cocaine, and had absconded from supervision altogether. *See* ECF 13-4 at 2. Moreover, after the Defendant had absconded from supervision, he was arrested in Jacksonville, Florida, on April 8, 2021, when the Defendant allegedly put his brother's girlfriend in a chokehold and later threatened to slit her throat and kill her. *See* ECF 13-1 at 2, 3. Accordingly, it appears that only imprisonment, rather than the threat of imprisonment, is sufficient to stop the Defendant from jeopardizing public safety.

### D. The Need to Provide Just Punishment for the Offense

Each of the foregoing factors weighs heavily in favor of imposing a significant term of imprisonment. Indeed, in the abstract, they might have collectively justified the imposition of a sentence much closer to, or even within, the guidelines range. But the need for the sentence imposed to provide just punishment for the offense warrants a downward variance. *See* 18 U.S.C. § 3553(a)(2)(A). Though the Defendant's conduct—obstructing justice in connection with a kidnapping trial—was extraordinarily serious, the kidnappers' conduct was even more serious. And, for committing the kidnapping, for example, Christopher Young and Tray Sherman were sentenced to 126 months' imprisonment. While the Defendant's criminal history is more extensive than Young's or Sherman's, it would not be just for the Defendant, as the victim of the kidnapping, to be sentenced to a term of imprisonment within the same range as his kidnappers for committing a nonviolent offense in connection with the trial—as offensive as the Defendant's conduct was. Nonetheless, any sentence less than 54 months' imprisonment would fail to achieve the other

sentencing goals described above.  The need to protect the public, to afford general and specific deterrence, and to promote respect for the law are too significant in this case.

**III.**      **Supervised Release**

As to supervision following the Defendant's sentence of imprisonment, the government submits that only the statutory maximum term, three years, is consistent with the factors identified in 18 U.S.C. § 3583(c)—considering the Defendant's abysmal performance on supervision during the past eight years.

**IV.**      **Conclusion**

Accordingly, for the foregoing reasons, the government requests that the Court sentence the Defendant to a term of 54 months' imprisonment and three years of supervised release.

Respectfully submitted,

Erek L. Barron
United States Attorney

By:      _____/s/_____
Jeffrey J. Izant
Assistant United States Attorney